Team 5103, Starr International Company v. United States Okay, I think we're ready. Thank you, Your Honor. May it please the court, my name is David Boyce, and I represent the plaintiffs. In this case, we have two appeals. And I think it's worth spending a moment at the outset to distinguish between what's involved in those two appeals. The court below found that there was an illegal exaction when the government demanded and acquired 80% of the AIG shareholders' equity and voting control. The court also held that there was no remedy for that because, based on this court's A&D decision, the court believed it had to do an economic analysis, and it concluded that the value of the authorized loan exceeded the value of what was illegally exacted. Mr. Boyce, would you agree that, well, let me ask you, is 13-3 money mandating? It is money mandating in the following sense, Your Honor. It provides for a specific amount of consideration that is compensation, and everything else... Do you have authority? For authority for the proposition that... Get that while I'm addressing the court's other questions. But what this court has held is that, in the Fifth Amendment context, the Fifth Amendment violation is itself money mandating. That is, if there is an illegal exaction... So you're going down two different roads, though. I think in the context of illegal exaction, it is the same roadblock. I think in the context of improperly and without authorization exacted, that is what is mandated to be returned to the citizen. I would agree if the court's question is, is there a provision in the statute that says, if you take it, you have to give it back? There is not a provision in the statute that says, if you take it, you have to give it back. Because we have to go down... I mean, you know perfectly well we're going to run all across this analysis the whole way, so we have to go down all those roads. I think that's exactly right. I'm going to do my best to do it in the time that I have. Are you addressing the standing issue at this point in your argument? I can, Your Honor. I'll just say at the outset, this is a little unusual, because you've got your claim and it deals exclusively with the damages problem, and then your friend has the burden and comes up on the others. But certainly, we expect that if we have questions, you'll be as I assume they will too. But with respect to the standing issue, I think there are three important aspects of that. First, as the court blow held, and we think correctly, the issue of control is relevant under Delaware law. That's the point of my concern. And when I look at standing, I look at the issue of control. It seems to me that you argue that the government exerted control in at least two different instances, maybe more. But going into the bailout and the negotiations, that there was control exerted there, and then control after the negotiations, and once they took 80% of the assets of the company. Is that... I think so, just one bit. There's issue of control on September 16th, and then there's issue of control on September 17th through 22nd. September 22nd was the date that the voting control and equity was actually exacted. So the cases that we deal with with control in corporate law, it's where an entity assumes a function or performs a function that's normally preserved to the board. What function is it that the government took in and performed that is traditionally a board function? What the government did, and the court found this is a factual matter, Your Honor. This is one of the distinctions that I was going to draw between their appeal and our appeal. Our appeal, they must convince the court not only that the trial court was wrong as a matter of law, but they must convince this court to disregard the trial court's factual findings because the court found as a matter of fact that the government controlled... Wait a minute. Let me just go back a little, and that is my understanding, so tell me if you disagree, is that the basis for the court of claims finding standing, and that's another question I have because it's not clear whether he actually found it or not. He seemed to set it aside a little, but in any event, you don't seem to embrace, as far as I can tell from your briefs, the theory upon which the court of federal claims rested to find standing. That is, the court of federal claims said, they're looking at the Delaware cases, and they're saying this is enough like Gatz and Rosette because even though we don't have shareholder control, there's still a fiduciary... There's no fiduciary duty, which is what those court cases spoke to, but I'm going to find there's a duty because the government has obligations as undertakings law, right? I didn't see where you kind of embraced that. You seem... Your argument in your briefs seem to be exclusively based on control, not shareholder control, but just this theory of control, but not the analogy that just the court of claims drew between fiduciary obligations being analogous to taking duties. I apologize for our lack of clarity Your Honor. We do embrace that finding. How do you make that leap then? Because the purpose of control under Delaware law is to create a duty. In other words, somebody who is not the board may not have a duty unless there is control. Here, as the trial court found, there was a duty under the Fifth Amendment, so you don't need control here. The first proposition is that we do not believe that you actually need to find control. However, we believe that you do find control. Now, in addition to that, I just want to be sure that I remind the court that we're arguing that under federal law, under Allegheny, there is standing as long as you have the kind of requisite impact that you do have here. That is, you do not have to rely just on Delaware law. That's right. Yeah, under the Yes, injury in fact. Okay, and particularization is necessary to establish injury in fact. Show me the evidence in the record that establishes particularization. That what happened was 80% of the voting control and 80% of the equity of the plaintiffs was taken by the government. Before September 22nd. Was Starr affected differently than other shareholders? Starr was not affected differently than other shareholders with respect to the fact that it lost 80% of its voting control and equity. It was affected differently because it's larger, but in terms of the proportional effect, it was not proportionally affected differently. Counselor, you say the government took 80%, but really the board voted this. The board granted 80%. It wasn't controlled by the government, was it? What the trial court found was that the demand for preferred stock with vote was presented to the board the evening of September 22nd. They weren't even told about it. When they In fact, the agreement was changed after the vote without the board's approval. What the district court found was that by taking control on September 17th, 18th, 19th, and 20th, the board was not in effect in control at that point. Right, because the government was a majority stockholder? I'm sorry, sorry. Because the government was a majority stockholder? No, no, but because the government at that point exercised the total ability to put the company into bankruptcy, not put the company into bankruptcy. That is to say, not to loan more money? No, not only not to loan more money, Your Honor. It was to call the demand notes that had been issued. Now, I also want, just to keep this whole thing in context, because as the court says, there are a lot of paths we go down. This is a case in which the government explicitly targeted these shareholders, specifically said, we want to punish these shareholders. Starr? Starr. Where did it say it wanted to punish Starr as opposed to the shareholders? No, by the shareholders, I Yes, including Starr. And punish, as it was explained, was in the abstract sense of the market punishes and relies. No, no, Your Honor, not at all. That wasn't said? Wasn't that Paulson's testimony? Here's what Paulson said. Paulson said a number of different things, and the district court had to sort out what to rely on, what not to rely on. District court heard the evidence, assessed credibility, and the district court's, the trial court's finding that this was a punitive purpose is supported by a lot of testimony, including what Mr. Paulson said at one point, quote, it was important to be seen as being harsh and punitive to the AIG shareholders in order to quell possible opposition to TARP and other further assistance. That's it. That was the moral hazard argument. That's not a moral hazard. To say quell possible opposition to TARP and other further assistance, that's not a moral hazard argument, I suggest, Your Honor. I suggest that my reading of the record was that when they said, at least the testimony I recall reading, was that when the statement was made about it being important to be harsh, it was made in the context of moral hazard. Am I not following that? No, I don't think that part of it is accurate, Your Honor. He did talk about moral hazard in other parts, but I don't think that was what we're referring to here. In addition, the Treasury Chief Restructuring Officer and their 30B6 witness testified that the Federal Reserve took nearly 80% of AIG's fully diluted common equity, quote, to penalize the shareholders of the company. Secretary Geithner, we forced losses on shareholders proportionate to the mistakes of the firm. Now, regardless of whether it's moral hazard or not, I don't think this is just moral hazard, but regardless of whether it's moral hazard or not, there can be no doubt that they are specifically targeting the shareholders to take something away from the shareholders, for good reason or for bad, but not TARP. No, all the shareholders, Your Honor, all the shareholders. And what I'm saying is I don't think there's ever been a case in federal jurisprudence in which the government has asked a particular group of people to take something away from them, for good reason or for bad, and the courts have said those people don't have standing to challenge the government action. In the Allegheny case, it was far less, far less extreme than we have here. In the Allegheny case, all you had was a order of the Interstate Commerce Commission that permitted the issuance of preferred stock that would dilute everybody. It would dilute everybody equally. Everybody equally in Allegheny. And yet the court held that shareholders had standing. I want to reserve some time for rebuttal. No, we'll let you, we'll restore your rebuttal time, but let me take you back to where we started, I think, which is the damages question. So it's not, the damages can't be the entire value of the stock, right? We have to compute some value. The value lost here, you allege, is the diminution of the voting rights, of their voting rights, right? It's the voting rights and the equity, it's the combination. So they didn't exact the stock. That's what they exacted. Did you have an expert testify as to what portion of the stock value of the stock share is worth $3.5? What value of that we can assess to the voting rights and the equity rights portion? Well, the voting rights and the equity rights combined together were the entire value of the stock. What we had, what the district court, trial court, focused on was the profits that they got from what they illegally exacted. In other words, the government illegally exacted the equity and the voting rights, and it then sold that. And you can calculate what the sale price was, but it ranges from $17.5 billion to about $23 billion, depending on what assumptions you use. But what the government has in its pocket right now are the profits from what it illegally exacted. That's in addition to the interest that they got. But what the government exacted in terms of what they ultimately, years down the road, sold and the value of that stock, that wasn't owned by the shareholders then, right? No, because it had been exacted by the government. What the district court, trial court, found was that there was no authorization to take equity and voting control. So when the government took equity and voting control, that was without congressional authorization. That was unlawful. And what the court held is that common sense would say, the government's got to give that back, and if it's already sold it, they've got to give back the profits. That brings me back to my continuing problem here. You keep saying that the government took control, that they took the 79% of the preferred voting stock. But actually it was AIG, it was the board of directors that voted to give the government this in order to survive. I think the court is exactly right about that in one respect. I think it's important though for the court to understand that in illegal exaction cases, time after time after time, the plaintiff has agreed to do what the government has asked. In the Kuntz case, the Supreme Court, and that's an unconstitutional condition case, and the court below held that unconstitutional condition law only applied to land use. We think that that's wrong. We think the Kuntz case demonstrates that's wrong. And we've appealed on that basis. But even if you assume that unconstitutional condition cases are not relevant in terms of the precise holding, the principle of Kuntz is applicable here. It seems to me that the exaction, and I think this, what I'm about to say, goes in your favor. I think that the exaction was not perfected until the board decided that they would not sue the government. And that left the stockholders with no remedy. I think that's the point of exaction. I think that's the ultimate point of exaction, Your Honor. I would agree with that. Because up until then, the company could always try to get it back. On the other hand, the government took the position that even the company couldn't get it back at that point. So you'd have to evaluate that aspect of it in terms of making that determination. So let's assume there's an exaction and the government took the property. Why, in the point of evaluation of what they took, don't we measure that at the point that the exaction took place? Yes, I think you do, Your Honor. And there you do have expert testimony from both our experts and their experts. And both testified that the value of what the government got was about the same, in the range of $25 billion. Now the difference, okay, is the government's argument is that you've got to offset the value of the loan against the value of what was illegally exacted. We think that is inconsistent with all illegal exaction cases. There's not a single illegal exaction case that has ever held that. Where do they say that? What? In our brief. And indeed, that's what they convinced the trial court of. And on page, I think it's 158 and 159 of their record is where the trial court's opinion discusses the economic analysis doctrine and holds it under A&D. It has a regulatory taking case, as we point out in our brief, that we think is not applicable. But the trial court believed that it was compelled under A&D to violate what the court says is common sense and hold that because the value of the loan, the value of the authorized loan, was greater than the value of what was exacted, there's no remedy. There's never been an illegal exaction case that said that. And we think that principle is directly contrary to the Supreme Court's 2015 decision in Coons. Doesn't your reliance on the Fifth Amendment, though, kind of butt up against that argument? I'm not sure I understand that, Your Honor. Well, if you're reliant on the Fifth Amendment, then don't we restore back, we force the government to get back exactly what it took? Yes, Your Honor. But at the point, the stock was almost worth nothing. No, at that point, even if it's only worth $2 a share, that's several billion dollars because of the number of shares that were taken. What if it's essentially worthless? It wasn't worthless first. Let's just call it a hypothetical. Hypothetically, if it was worthless with the loan, then there would be no value. You've got two questions. One, was it worthless without a loan? And two, what was its value with the loan? And sort of three is, what was its value when the initial loans aren't enough? But that's what both experts testified about, what it was valued at the time of the initial loans. For example, because the number of shares involved, as the court found... I think you see what I'm asking you. That is, rather than valuing it at the time of the initial loan, look forward and say, uh-oh, that initial loan would have left it worthless anyway. But that's not what their expert testified, our expert testified, not what the government estimated at the time in contemporaneous documents, not what AIG estimated at the time in contemporaneous documents, or what the trial court found. All of those put a value... Now, if you looked ahead, with everything else that happened, there was a time when the value was much higher. What that guy does, over the course of what seems like minutes, those numbers are going from 8 to 17 to 43 billion, and at a point, they settle on that initial loan number. But it's not enough. Well, Your Honor... If the government had said, okay, we quit, following the initial loan, AIG would have gone on. Your Honor, there's no finding of that, and I don't believe that that is accurate, as a matter of fact. There was a desire to restructure, and everybody said that restructuring was a good idea, but the government talks about 185 billion dollars. There was never, at any point in time, 185 billion dollars loaned. What happened was that the form of the loan changed, and when TARP came in, they took some TARP money, and they actually reduced the amount of the 13-3 loan. So, I do not think it is accurate to say that if they simply made the original 85 billion dollar loan... In fact, I'm not even sure that there was any time when it exceeded 85 billion dollars. If there was, it was for a very, very brief period of time. So, you can't look at this number that was the possible aggregation of all forms of loans that were out there. You've got to look at what was actually loaned, and there's nothing in the evidence, no finding, that suggests that the company would not have had value with just the first loan. In fact, both experts testify. I don't think the value here is really subject to dispute. The dispute, because everybody's testified that this had value to the government. The issue is whether you can offset because of the value of the loan. And we agree that that loan was very valuable to AIG. It seems the value to the government really was to prevent all the policyholders who had effectively insured against their financial risky conduct from going under all across the mark. There was a great deal of that, Your Honor, and indeed one of the things that the trial court finds is that what happened was when the government took control of AIG, they used AIG funds to pay people off 100 cents on the dollar, give releases, because that supported the Goldman Sachs' and the Morgan Stanley's of the world. When you say they, you mean AIG? Well, I mean the government used AIG's funds to do that. The government used its control over AIG  in order to bulk them up. Where in the record is a directive from the government to AIG to make those plans? Well, you have to look at three things. First, the government took over negotiations with Morgan Stanley and Goldman Sachs. There is dispute in the record as to why it did it, but there is no dispute in the record that they took over those negotiations and that they gave them 100 cents on the dollar. Now they say, well, we had to give them 100 cents on the dollar, because that's what they wrote. That's contrary to what every other negotiation going on at that point in time where everybody else was taking haircuts. But they say we had to give them 100 cents on the dollar. But they didn't, in addition to have to do that, have to give them releases. So the government did that and there's no question that this was done when the government was controlling AIG. The government had the ability at any point in time to remove the board while it was doing this. There can't be any doubt that the government controlled AIG at that time. No, you say there can't be any doubt that AIG controlled or that the government controlled AIG at that point. I don't see anything in the record, and I think I said this before, I don't see anything in the record that shows that the government usurped or exercised the type of duties and functions that a board normally does. And in fact, you can have a minority shareholder that has control over a corporation, can't you? In some circumstances, I think you could. So don't you have to have a showing that, not that you have control, that you're a majority shareholder and therefore you have the capacity to control, you have to show that you actually exercise that control. And where did that happen in this situation? Your Honor, we think it happened in a whole variety of situations, including when they unilaterally replaced the CEO with somebody that they picked and didn't even have the board know about it until after he'd been offered the job. There are a whole series of things that happened there, but I would just ask the Court to consider two things. First, the Court made a factual finding below on this, and the Court has lots of evidence to support it. Now, could you argue that they didn't really exercise control? I don't think that would be a very persuasive argument, but whether or not you can argue that, the trial court made a factual finding on this, and it's well, well supported. We think, by overwhelming evidence in the record, that they had the ability to replace the board at any time, they talked to the board members about being replaced, they asked them whether they were willing to resign, they put in their own monitoring team, the trial court quotes the reports the first day, you know, we're now here to run the company, Mr. Geithner says to Sarah Dahlgren, who was the head of that team, we're going to loan money to AIG and you're going to run it. There is a plethora of evidence in the record about control. I do want to keep coming back to the fact, though, that control is not essential to our standing here. First, for the point that the Chief Judge raised, which is the theory of the trial court, was that there is a Fifth Amendment duty regardless of whether there is control, and second, because under federal law, if people are targeted, even if they're not targeted, if they have an effect under Allegheny, there is standing in federal court to try to address that issue. We are way above where we started, and we will restore your four minutes of rebuttal, which means that in total we've gone over 18 minutes, so why don't we add something along those lines? Please, you don't feel compelled to use it, just to even things out. I hate to say this, 18 minutes to your time. We may make you use it. I will be as brief as the court wishes. Mark Stern for the United States. The focus on what the actual claim in this case is, and what happens in the relevant period. The claim concerns the loan that was made. Let me cut to one of my core questions. I started with Mr. Boyce on this, but if we find that the government's actions were authorized by 13-3, is the takings claim properly in front of us? The takings claim? The trial court didn't reach the takings claim. The trial court did find that nothing was taken, and at this point I understand Starr's argument to be that A&D Auto, in a but-for scenario, would compel the trial court's conclusion if this were a taking claim, but this isn't a taking claim, so A&D doesn't apply. So I think that the trial court's reasoning would dictate that the takings claim is gone, but to be fair, the trial court didn't reach it. Can we start at the standing question? Absolutely. And could you start by responding to your friend's citation to Allegheny and this sort of alternative argument with respect to standing under federal law? There's no separate doctrine. Allegheny has not spawned a separate doctrine. The suggestion would be all Alleghenies, and we discussed this in our reply brief, when you look to see what was going on in Allegheny, it's the kind of deal in which majority shareholders affecting control managed to get a better deal for themselves than for other shareholders. And the Supreme Court says, look, that's an injury to those shareholders in particular. And this Court and other courts have never suggested that there's a different rule in cases like this Court's decision in RoboWash. And of course, like the Delaware courts, in a case like J.P. Morgan, which crystallizes a lot of the principles that have informed this Court's and other federal courts' reasoning, that was a case in which, as there was a merger, plaintiffs are saying that too much stock was issued in the course of the merger, that their interests were diluted. Delaware Court says that's a classic derivative claim. You don't get to pursue that. And this case is also a classic derivative claim. I mean, these claims, again, would belong, if they were valid claims, they would belong to AIG. So what happens in this situation? And I agree, the claims belong to AIG, but the board said we're not going to sue the government, we're not going to do anything about this. What does that mean to stockholders in that situation? It leaves them in this lawsuit asking the trial court to overturn that decision, because that's what you do if you go to the board, the board says, no, we're not doing it. And the trial court in this case, because remember, originally AIG is a defendant in this case also, and it was a defendant because the same claims that are being asserted against the United States were also being asserted against AIG. And the trial court says, no, this was an exercise of business judgment, which under governing law, I'm not overruling. But in a situation involving the nationalization of a bank, it just strikes me as somewhat contrary to the Fifth Amendment to permit that to happen. I can see having perhaps a scenario where you have an administration that's bent on nationalization, or that sees that as a gank. And we're in a situation now where under the law as you express it, the shareholder is left without a recourse. Your Honor, there's no argument, as far as I understand it, that says, I don't even understand plaintiffs to be arguing that these principles don't apply. The argument that they've been making is that they fit within an exception, and they've sort of said, well, there's a fiduciary duty. And that's their argument. And this is not a nationalization of anybody. I mean, that's a total sort of I think misconception that gets raised once or twice in plaintiffs' brief. Remember, what happens, and the Federal Reserve and the Federal Reserve Bank of New York had no interest. I say nationalization because the government ended up owning 80% of a bank. That's right, it did. But here's what happens. The last thing that the Federal Reserve and the Federal Reserve Bank of New York wanted to do, and this is the last thing they wanted to do, was to get involved in AIG. AIG, for the course in the few days before September 16th, which is when the AIG board votes to accept terms of the loan, what's happening is that AIG's sort of liquidity shortfall estimates are going from something like $14 billion to $90 billion. On the 15th, Lehman Brothers goes into bankruptcy. The markets are sort of absolutely trembling at this point. And what the Fed and the Federal Reserve Bank of New York is, we want to have a private sector solution to this. The private sector bankers—Counsel, please stop nodding. You're distracting me. I'm sorry, stop nodding. I didn't realize I was nodding. You're right after private sector solution. Right, I'm sorry, Your Honor. The private sector solution, the bankers work through the night of the 15th, and what they do is they come up with a term sheet that includes 79.9% of an equity interest, plus all the collateral, sort of pledged loan. Nobody wants to touch this because and the record is just replete with nobody knows just how bad AIG is. They know it's terrible, but nobody is willing, even with those terms, even with the 79.9%. Nobody— Can I take you to the question of the legal exaction and the statutory provisions? Of course, Your Honor. The provision you're relying on, 13.3, is dealing exclusively with interest, right? And now you say, well, the other side concedes that could include fees and expenses, so that gives you the leeway to put all this equity in there. But that's what the language says, though. The language is dealing with interest payments, right? No, Your Honor, we don't agree with that. It's also not what the Federal Reserve understood to be the case. What this says is that all you have a reference to interest payments and then the same section of 13.43 says that all the loans shall be subject to limitations, restrictions, and regulations as the Board shall require. And I take that in combination with the provision in 12 U.S.C. 341, which is modeled on the National Bank Act provision. And what this says is you have the powers necessary to engage in the business of banking. So what happens here is that the Fed is doing exactly what the private sector people thought was the business of banking. And there's lots of testimony in the record about how taking an equity stake is a not uncommon thing to do. Yeah, but it's a lot to ask, is it not, to find in this sort of additional powers thing as Judge Reyna said, a pretty extreme and important and consequential ability here, right? I mean, at least in 13.43 it says an unusual and exigent circumstances. But when you go back and you want to rely on the other provision too, it seems like I think that the two of them make sense together, Your Honor, because this only comes up in an unusual and exigent circumstance. And what the thrust of this provision is, is to put restrictions on the times when these kinds of loans can be authorized. And there's lots of testimony about how the Fed and the Federal Reserve Bank of New York have to go through the analysis of going, is this really a loan of last resort? Does AIG fit within this? Is that decision reviewable by a court? I mean, does the court then apply the statute and review their decision that this was unusual and exigent? And if the reviewing court concludes that it wasn't, then they don't have the authority? Well, if one imagines that there was a decision filed to say this deal can't go forward because the Federal Reserve has no authority, then a court might conclude that this is committed to agency discretion by law, but assuming that that's not true, then the court would presumably say yes, that's not lawful, and issue it to your own. Assuming that it is discretionary, is it not unreasonable to interpret restriction to include the restrictions that were placed on the loan relating to the shares? Well, I think that it was reasonable for the Fed, and it's... I gave you a double negative, not unreasonable. Yes, we think it was not unreasonable. And again, this is... When the government moved under these legal provisions that we're talking about, it did so in pursuit, as you point out very well, let's call it a legitimate objective, the legitimate legislative objective, and to create stability in the marketplace, all of that. That's the benefit that accrues to the government when it exercises these provisions. Now, we also have the government's already benefited here. It's realized its goal, the stability in the market. In the Fifth Amendment, does the exercise of these provisions also lead to the $18 billion it's called in the brief, windfall, or the $18 billion that they end up with in this case? Your Honor, there is no windfall in this case. The windfall... I said call it what you want. The government ended up with $18 billion profit. Well, what the government ended up with is the equivalent of a 5.7% annualized return on its investment. But the purpose of this statute is not to give the government a return. Well, it's certainly not to put the taxpayer at risk for $182 billion. But knowing that didn't happen, the government realized its legitimate goal. No, no, no, the government doesn't... this is not a bailout provision. I mean, that's one... this is absolutely clear from... nobody's really disputing this. This is not a provision that says in order to bail out the economy, the Federal Reserve, regardless of the extent to which it thinks taxpayer money is being put at risk, can just go ahead in order to stabilize the economy. Nobody thought that that was something that they could do. On the contrary, what's clear is from Secretary Geithner and everyone else that's involved is they've got them like they're going, have we sort of done all we could to secure this loan by including the equity participation and all the other things. And everybody also recognized that you know, and the Southern District of New York case sort of recognizes too that all of these terms compensate the government for putting in billions of dollars that they might never see again. I want you to talk a little bit about interest rates because one of the arguments that the other side makes is that the rates imposed were exorbitant. And I'm particularly interested in the 13th Street phrase that the rates are to be such that they accommodate commerce and business. And my take on that, I'll tell you right now, is that it's not necessarily to accommodate AIG. It's about the overall marketplace as a whole. That's exactly right. As it turned out, this saved the bacon of AIG shareholders, but that was an incidental sort of result. That's not why this loan was made. But I'm talking about the rates. Oh, the rates? I mean, that's not part of plaintiff's claim. I mean, the plaintiff's claim is strictly that you couldn't do equity and what this... I know, but the trial court made a great deal of that saying that it was punitive. Follow me, please. And my interest in that is that my read of it is that what the government was doing was establishing those rates again to create that moral hazard. Your Honor, the testimony at trial, which I'm of course having all these notes, I can't find the precise point, but I know that Jimmy Lee and others testify that what you would have had without the equity term is a far higher interest rate because an equity just substitutes for interest in this context. So you would have had an enormously higher rate. And remember, the government not only is the original, well, crucial, as the trial court finds, if the government hadn't then kept restructuring and pumping in more money, AIG would still have gone down and the government kept lowering the interest rate and putting more money in as time went on. Again, the interest rate is not part of Starr's claim, but as far as it goes, it doesn't even begin to capture all the different things that the government did to preserve AIG and preserve the value of Starr's shares, which is the trial court, even though the trial court may sort of said things about punitive, it also said, look, if the government had wanted to punish Starr, well, AIG, not Starr, because I think your Honor is absolutely right, there was no singling out of anybody. If the government had wanted to punish AIG, all it needed to do was to do nothing. And then that would have been it. So the idea that there was some other punishment involved other than sort of the decision to come in and save it. And again, the contrast that gets drawn between other loans, the other loans, as the record shows, you have loans being made on a very short-term basis, sometimes overnight loans. They're being made through banks who are subject to the regulation of the Fed. They've got long-standing knowledge of, the Fed has long-standing knowledge of these institutions, and their collateral is liquid. They know what they've got. Here, like AIG's, to the extent that there are assets, there were largely assets in the insurance subsidiaries. Nobody knew for sure what their value was. They were subject to seizure by state regulators, and it was assumed that probably if AIG went into bankruptcy, the value of those subsidiaries, whatever it was, would further decline. So the attempt to compare that to sort of these very short-term loans that are backed with good collateral is a non-starter. Councillor, what do you think was the rationale behind the government's move to convert its 79% interest in AIG and convert that to a preferred stock? I mean, it was going to take some form. I mean, the equity was going to take a form. The term sheet... It already had a 79% equity stake. Well, I mean, the equity stake had to take a form, and the term sheet that was given to AIG that AIG voted on on the 16th referred to the 79.9 equity in a form to be determined, and the credit agreement specified sort of a preferred convertible stock. The suggestion in the 16th, though, was that, oh, you're dealing with warrants, right? No, there was no suggestion in that term sheet. Was the term sheet lifted from the prior private negotiations? It was, in part. It was so that there was always going to be a... And remember, it doesn't matter for Starr's theory whether this is warrants or anything else. Warrants are a form of equity. They just give you a right to... I mean, they... Wait, I thought it made a lot of difference. If there were warrants, wouldn't the government have been on the hook for an additional $30 billion? No, I mean, because the government's more like... The term sheet, the private sector term sheet, called for penny warrants, which meant that you would essentially have a nominal strike price for purchasing, and that itself was a placeholder. So the ability to take equity sort of is there throughout. But what's the case is that there is... That the term sheet that goes over to Starr's board of directors... And also the testimony's clear that Starr always expected that there would be an equity component to this deal. But when the government took... Changed, converted the stock, or actually took the stock in the form of a preferred voting stock, doesn't that have the effect of diminishing the voting power of the common stockholder? Well, this isn't the case about voting rights at this stage. I mean, yeah, any time... A corporation can issue new stock. That's one of the things that it does to raise money. And when a corporation issues stock, if it's doing it in a good deal, then the value of everybody's shares goes up. Does it mean so that you have a smaller percentage piece of a larger pie? Does it mean you have somewhat less voting rights? Yes. Does it mean you have more money? Absolutely. And that's all that happens here. You have the government pumping in a lot of money. Starr's percentage of the company goes down. The value of its shares just starts going up instantly. And so what you have is just a situation where you otherwise would have been in bankruptcy. And as the Proud Court says, your shares would have been worth absolutely nothing. Instead, you have the government come in and do this and saves AIG. Well, you seem to be saying two different things. The theory the Court of Claims said was, well, if you look at the big picture, high up above, they would have had bankruptcy. If not, there can't be any damages at stake. It's quite another thing to talk about whether or not... It seems what you're saying is, though, if they're confined to the lost value, the diminution of value based on voting rights, diminution of voting rights and equity, you're saying that just isn't worth anything. Why? Because it's immeasurable? I mean, there was expert testimony, right? That's never been the theory of the case. What Starr wants, its claim isn't that if we had had more voting rights after September 22nd that their claim would be any different. Their claim is that this is the period, I mean, this is a closed class, and the period that they're focusing on... Well, they're talking about the effect that it had on their shares by increasing the number by issuing all of these... Right, and the effect, I mean, they like to say that this is the equivalent of taking four out of every five of my shares. Their shares, if they kept them in a safe deposit box, their shares were there beforehand, they're there during, they're there after. The only difference, and so that Starr can't argue that its shares were exacted. Its claim is the value of their shares is exacted. And that value, the loss part of that is the loss of voting rights. Again, that's not been, I mean, there's not been any attempt to fit that within the illegal exaction theory that is part of this case. Theory has always been that you should pay money for, sort of based on, pick a day, could be 15 billion, could be 24 billion. But that's the theory, and it's totally unconnected to what voting rights after September 22nd were. Is there any reason why, when we do our standing analysis, that it should be any different to the reverse stock split class? Well, the reverse stock split, that really is about voting rights, unlike this, the primary claim. So, we haven't contested that that is a direct claim. It's just that it's profound, it's meritless. But we haven't contested that that's a direct claim, because there the argument is that certain minority shareholders really were, sort of, bad things were happening to them. Again, there's no merit to it, but that's a direct claim. A claim of the kind that forms the central part of their case, that's quintessentially derivative. That was AIG's claim to bring. Starr went to AIG, said, bring it. AIG exercised its business judgment. Starr goes to the Court of Federal Claims here, says, overturn it. The Court of Federal Claims says, no, they exercised their business judgment, and I'm not overturning it. I thought the standing issue and the difference between the reverse stock split and the equity claims had to do with the timing, because the equity claims came at a time before the government actually held the equity. Yes, that's right, Your Honor. And during the reverse stock split they were some sort of majority or controlling entity. Am I wrong about that? Tell me if I'm wrong. No, no, you're right, Your Honor. I guess I wasn't. That's true. And what the claim is that the majority shares were being used in a way to deprive like... Which would come under the exceptions for Rose Underose. That's right. And that's why we haven't contested that. We just don't think there's any merit to it. We're going to stop you. Because you've been very generous with your time. Thank you very much. I'll try to go quickly, Your Honor. First, with respect to Allegheny, Allegheny was not a suit against a private party or the board. Allegheny was a suit against the ICC, but they were suing and the court held in Allegheny that there was standing to sue the government because the government had facilitated dilution. And it was dilution that affected everybody equally. There wasn't any issue there of the government having control. There was private parties that had control. Second, the Takings case is not now before the court because the trial court didn't reach it. There are a number of issues that we'd have to... If we lost on Illegal Exaction, there are a number of issues that we would have to address on the Takings claims. The Takings claim is not solved by AMD, which is a regulatory case. In addition, if we were to lose on Illegal Exaction, we've got to address the Unconstitutional Conditions decision, which is an Unconstitutional Conditions decision that we think the court made before Kuntz. And then you'd have to particularize. Yes, but I think, Your Honor, for example, in Allegheny, the particularized was simply dilution. I think the United States Supreme Court in Allegheny makes absolutely clear that dilution, even if it affects everybody, is a particularized claim. With respect to the suggestion that all they did was adopt a term sheet, that's not accurate. There's nothing in the... I don't think he said that. I think he said they started with the term sheet. In that case, that could be accurate. But there's a huge difference between the private term sheet and what ultimately turned out to be the case in terms of that was non-voting warrants. He said they wanted pennies. They couldn't get pennies without votes. The votes were critical here. Absolutely critical. And one of the things that we've repeatedly said in our briefs and in our proposed findings to the court and in our arguments to this court is that by changing it from warrants to voting preferred, and it's replete in the record, as a trial court found, replete in the record, that that was their intent. Their intent was to deprive the shareholders of the right to vote. They were afraid the vote was going to come out the wrong way. And so they took the preferred stock rather than the warrants because they knew they couldn't get stock if all they had is warrants because the common shareholders would never have voted to give it to them. With respect to the Your Honor's question about whether they... You say that with such confidence. When the value went below a buck and the stock exchange was going to start voting along with... What percentage did Starr own, by the way? Altogether, maybe 20%. Starr voted along with everyone else. Yes, because, Your Honor, what they did and this is really important, they delayed the vote until the last minute so that they either took 20 to 1 or nothing. They could have avoided delisting by a 5 to 1 reverse stock split that would not have had given them the ability to do the exchange they wanted to do. They could also have applied it to both issued and outstanding shares. There's not a single explanation in the record as to why they applied it only to the outstanding shares and not the issued shares. So I think that really supports our argument very strongly. With respect to the issue on interest, the only thing that's specified in the statute is interest. To talk about this as being a restriction or a limitation, I think, is not following the plain language and it makes... With respect, Your Honor, it makes no sense. In the interest rate, the statute says you've got to get... The Board of Governors has got to determine it, not the bank. The Board of Governors has got to determine it. It says it has to be set with a view towards accommodating commerce and business. If you had total power to set any compensation you wanted because of restrictions or limitations language or incidental language, you wouldn't need any of that. It would all be surplusage. Try to think of the hypothetical congressional intent that would say, we are going to make it really... We're going to put all sorts of restrictions on what kind of interest rate you can charge, the normal compensation for a loan, but we're going to give you absolutely carte blanche for grabbing equity. That makes no sense. Well, it doesn't say the normal compensation for loans. It says accommodating the generalized market. And in my view, accommodating the generalized market under these circumstances might be very high interest rates because of the moral hazard issue. It might be, Your Honor, but they admitted, and the court found, that there was moral hazard to lending to Morgan Stanley, moral hazard to lending to Goldman Sachs, moral hazard to lending to all these other banks, and yet they lent to them at 2 or 3 percent interest and didn't take any equity at all. I really respectfully suggest that this was not a moral hazard issue. There's no finding of that. There's no finding that says we're going to uniquely discriminate against the AIG shareholders because there's a peculiar moral hazard that relates to AIG that doesn't relate to these other people. I don't think they were using it as morality. I wasn't meaning morality. I meant moral hazard in the sense that I think the court was using it, which is in the sense you don't want to induce bad behavior. Final thought, because we're going to have to conclude. Can I say just one thing? Yeah, that's what I said. You get one final. Thank you. To talk about the taxpayer at risk, at page 199 of the record, the court's opinion, it quotes what they were saying at the time. The time they did the deal, we're going to earn tens of billions of dollars from the equity. They didn't think this was risky. The statute says it has to be secured. They told Congress it was not at all risk. This idea that this was a highly risky thing, they needed to do all this thing to compensate for risk, is made up after the fact. And in any event, that's not the way the statute was written. That's not the way Congress wrote the statute. Thank you. I'll be extremely brief. If the court has any questions about it, I would just point out that there are some grounds for reversal on the liability ruling that we didn't get into, such as the nature of the statute. It's not being enacted for the benefit of entities such as AIG. We would direct the court's attention in particular to the analysis of Rough Diamond. Thank you. We thank both sides. That concludes the cases submitted and that concludes our proceedings for this morning. All rise.